1
2
3
4
5
6
7
8
9
10          UNITED STATES DISTRICT COURT
11         SOUTHERN DISTRICT OF CALIFORNIA
12

13   ROSA MARIA V.,                    Case No.:  19cv1312-RBB

14                        Plaintiff,
                                       **ORDER DENYING PLAINTIFF'S**
15   v.                                **MOTION FOR SUMMARY**
                                       **JUDGMENT [ECF NO. 23] AND**
16   ANDREW M. SAUL, Commissioner of   **GRANTING DEFENDANT'S CROSS-**
     Social Security,                  **MOTION FOR SUMMARY**
17                                     **JUDGMENT [ECF NO. 24]**
                         Defendant.
18

19
20          On July 15, 2019, Plaintiff Rosa V.[1] commenced this action against Defendant
21   Andrew M. Saul, Commissioner of Social Security, for judicial review under 42 U.S.C.
22   § 405(g) of a final adverse decision for social security benefits [ECF No. 1].  On August
23   6, 2019, Plaintiff consented to the jurisdiction of Magistrate Judge Linda Lopez [ECF No.
24
25   _____
26   [1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local
27   Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).
                                          1
28                                                        19cv1312-RBB

6].[2]  Defendant filed the Administrative Record on November 22, 2019 [ECF No. 16].
On March 11, 2020, Plaintiff filed a motion for summary judgment [ECF No. 23].
Defendant filed a cross-motion for summary judgment and opposition to Plaintiff's
motion for summary judgment on April 15, 2020 [ECF No. 24].  Plaintiff and Defendant
filed reply briefs on May 7 and 8, 2020, respectively [ECF Nos. 28, 30].  On May 26,
2020, Judge Lopez transferred this matter to Magistrate Judge Ruben B. Brooks [ECF
No. 31].  Plaintiff's consent to Judge Brooks's jurisdiction was filed on June 23, 2020
[ECF No. 32].

    For the following reasons, Plaintiff's motion for summary judgment is **DENIED**,
and Defendant's cross-motion for summary judgment is **GRANTED**.

## I.    BACKGROUND

    On October 20, 2015, Plaintiff filed an application for disability insurance benefits
under Title II of the Social Security Act.  (Admin. R. 23, 235-36, ECF No. 16.) [3]  Rosa V.
alleged that she had been disabled since November 4, 2014, due to chronic insomnia,
depression, headaches, back aches, joint pain, and memory loss.  (Id. at 281.)  Plaintiff
was born in 1959 and was employed as a housekeeper at the Manchester Grand Hyatt in
San Diego at the time she stopped working.  (Id. at 272, 356.)  Her disability application
was denied on initial review and again on reconsideration.  (Id. at 161-64, 168-72.)  An
administrative hearing was conducted on June 20, 2018, by Administrative Law Judge
("ALJ") Jay E. Levine; on September 18, 2018, he determined that Plaintiff was not
disabled.  (Id. at 23-31.)  Plaintiff requested a review of the ALJ's decision; the Appeals

---

[2] The United States has informed the Court of its general consent to Magistrate Judge jurisdiction in
cases of this nature.

[3] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to
the administrative record using the page references contained on the original document rather than the
page numbers designated by the Court's case management/electronic case filing system ("CM/ECF").
For all other documents, the Court cites to the page numbers affixed by CM/ECF.

2

Council for the Social Security Administration denied the request for review on May 22, 2019.  (Id. at 1-4.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

**A.   Medical Evidence**

Plaintiff received regular medical care at the SIMNSA medical office in Tijuana, Mexico between 2010 and 2015.  (Id. at 362-437.)  Her medical records reflect multiple complaints, including anxiety, insomnia, sleep apnea, tension headaches, depression, and neck pain dating back to 2010.  (Id. at 421-31, 433-35, 437.)  Her anxiety and depression symptoms continued into 2011 but appeared to improve with prescribed medications. (Id. at 412-19.)  A psychiatrist noted that Plaintiff needed to wean off benzodiazepines due to a dependency on these sedatives.  (Id. at 416.)  In 2012, Rosa V.'s depression, anxiety, insomnia, and low back pain were under control.  (Id. at 405-07.)  In June 2013, she reported right lumbar pain that radiated into her right leg.  (Id. at 398.)  But in August and October 2013, Plaintiff's physicians noted that she had persistent anxiety and insomnia.  (Id. at 392, 394-95.)

Rosa V. reported continuing low back pain on March 28, 2014.  (Id. at 387.)  On October 2, 2014, she complained of exhaustion and excessive tiredness.  (Id. at 381.) Treatment notes from November 4, 2014, the day she stopped working, indicate that Rosa V. was suffering from asthenia (lack or loss of strength), adynamia (asthenia caused by disease), headaches, and exhaustion due to stress at work.  (Id. at 380.)  On December 1, 2014, she presented with vertigo symptoms.  (Id. at 377.)  Plaintiff's treatment notes from January 2, 2015, indicate that she had suspended her treatment for bipolar disorder because of the side effects, and she did not trust the prescribed treatment.  (Id. at 367.)  In March 2015, Plaintiff's prescribed medications included Brintellix, Rivotril, and Plantival.  (Id. at 359-60.)

On March 27, 2015, Rosa V. underwent an internal medicine evaluation with Amy L. Kanner, M.D., at the request of the Department of Social Services.  (Id. at 574-81.)

1   Plaintiff's chief complaints were lower back pain, neck pain, and vertigo.  (Id. at 575.)

2   She told the examiner that she was on disability from work due to depression.  (Id. at

3   577.)  Dr. Kanner examined Plaintiff's claimed conditions; each was within normal

4   limits, and the doctor opined that Plaintiff had no physical functional limitations.  (Id. at

5   581.)

6            Plaintiff established care at the Family Health Centers of San Diego on October 16,

7   2015, for treatment of her insomnia and anxiety; her initial consultation was with nurse

8   practitioner Teresa Aldana.  (Id. at 591-93.)  She received a behavioral health assessment

9   from licensed clinical social worker Martha Jasso-Ramirez on November 17, 2015.  (Id.

10   at 600.)  Plaintiff reported that she had a long history of anxiety and depression that had

11   started about seven years earlier when her workload as a hotel housekeeper doubled from

12   cleaning sixteen rooms a day to thirty to thirty-two rooms.  (Id.)  She became very

13   stressed and injured herself several times trying to keep up with her work until she quit in

14   2014.  (Id.)  During her examination, she was alert and showed coherent thought process,

15   appropriate affect, and normal memory, but exhibited a depressed and anxious mood.

16   (Id. at 602.)  Shortly thereafter, on November 30, 2015, Plaintiff underwent a psychiatric

17   medication evaluation with Dr. Joe Sepulveda.  (Id. at 597-99.)  Dr. Sepulveda observed

18   that although Rosa V. primarily complained of insomnia, it became apparent during the

19   evaluation that she "contends with a significant amount of anxiety bordering on

20   neuroticism."  (Id. at 597.)  The psychiatrist noted that Plaintiff spoke nonstop for forty

21   minutes but was not pressured in speech and paused at appropriate intervals when she

22   needed to collect her thoughts.  (Id.)  He also determined that Rosa V. had taken

23   benzodiazepines, primarily Klonopin, chronically for the past ten years and had become

24   physically dependent on them.  (Id.)  He found Plaintiff had a history of, but no present

25   symptoms of, major depressive disorder, and a history of significant anxiety bordering on

26   neuroticism, but did not believe her history supported diagnoses of psychosis or bipolar

27

28

1   disorder.  (Id.)  Dr. Sepulveda directed Plaintiff to restart Klonopin, for which she would

2   require a slow taper over a long period of time to prevent withdrawal symptoms, and

3   prescribed Effexor (for depression and anxiety) and Trazodone (antidepressant).  (Id. at

4   598.)  He also recommended therapy to develop better coping skills for anxiety and a

5   sleep study in the future if needed.  (Id. at 599.)

6          Two months later, on February 8, 2016, Plaintiff returned to see Dr. Sepulveda and

7   reported that she had received rehabilitation services in Mexico and had successfully

8   weaned herself completely off benzodiazepines.  (Id. at 594.)  She stated that she still had

9   insomnia, did not find Trazodone to be helpful, did not want to take Effexor, and only

10  wanted non-addictive medications for sleep.  (Id.)  Rosa V.'s mental status examination

11  revealed linear and coherent thought process, appropriate judgment and insight,

12  appropriate attention span and concentration, appropriate remote and recent memory, and

13  euthymic mood and affect.  (Id. at 594-95.)  Dr. Sepulveda made a note in Plaintiff's

14  record to not prescribe any controlled substances and provided her with a prescription for

15  Doxepin.  (Id. at 595.)[4]

16         On April 12, 2016, Plaintiff returned to Nurse Practitioner Aldana at Family Health

17  Centers and reported that she had not responded well to Doxepin and was unable to sleep.

18  (Id. at 930-31.)  She also complained of low back pain on a scale of seven out of ten.

19  (Id.)  Nurse Aldana ordered lumbar x-rays, which showed scoliosis and moderate disc

20  height narrowing at L3-4, and a sleep study.  (Id. at 611, 932.)  Plaintiff then received an

21  internal medicine evaluation from Phong T. Dao, D.O., on April 13, 2016, at the request

22  of the Department of Social Services.  (Id. at 604-09.)  Her chief complaints were back

23

24  _____

25  [4] Two months later, on April 8, 2016, state agency psychiatrist Heather Barrons, Psy.D., reviewed
26  Plaintiff's file and prepared the Psychiatric Review Technique and mental residual functional capacity
    assessment upon which Plaintiff's arguments are based.  (See Admin. R. 138-42, ECF No. 16.)  Dr.
27  Barrons's opinion is discussed in greater detail below.

5

28                                                                                              19cv1312-RBB

1    pain and depression.  (Id. at 604.)  Dr. Dao noted that Rosa V. had tenderness to palpation

2    of the lumber spine with normal range of motion; negative straight leg raising test; intact

3    motor strength, sensation, and reflexes in the lower extremities; and normal gait.  (Id. at

4    608.)  The doctor opined that Plaintiff could lift, carry, push, or pull one hundred pounds

5    occasionally and fifty pounds frequently, could stand or walk for eight hours in an eight-

6    hour workday, and could sit with no limitations.  (Id.)

7        Rosa V. had a follow up with Dr. Sepulveda, the psychiatrist, on June 3, 2016.  (Id.

8    at 613-16.)  She told him that she felt chronically exhausted and was unable to sleep.  (Id.

9    at 613.)  Dr. Sepulveda observed that Plaintiff appeared alert and rested; he remarked that

10   it was "[u]nclear if she subjectively feels lack of sleep vs. true insomnia[.]"  (Id.)  The

11   psychiatrist prescribed Ambien at Rosa V.'s request because Doxepin and Melatonin

12   were not helping her sleep.  (Id.)  Plaintiff's psychiatric care was transferred to Deborah

13   Birnbaum, M.D., on August 22, 2016.  (Id. at 622.)  Rosa V. informed Dr. Birnbaum that

14   she was receiving injections of an unknown medication from an "addiction specialist" in

15   Mexico.  (Id.)  Dr. Birnbaum discontinued all of Plaintiff's previous insomnia

16   medications, which Plaintiff stated were not working, and put Rosa V. on a trial of

17   Seroquel, to which Plaintiff was later found to be allergic.  (Id. at 623, 797, 923.)

18       Plaintiff underwent a sleep study at Eastlake Sleep Center on September 9, 2016.

19   (Id. at 625-27.)  The study demonstrated that Plaintiff had obstructive sleep apnea, for

20   which the use of an auto-titrating CPAP (continuous positive airway pressure) machine

21   was recommended.  (Id. at 626.)  Dr. Birnbaum, who had not yet seen the sleep study

22   results, placed Rosa V. on a trial of Remeron on September 19, 2016.  (Id. at 797-98.)

23   Plaintiff requested a CPAP machine from Family Health Centers on October 19, 2016.

24   (Id. at 899.)  She reported at that time that she slept for four hours a night and

25   experienced tiredness and low energy daily.  (Id.)  Dr. Birnbaum, the psychiatrist, saw

26   Plaintiff again on November 21, 2016.  (Id. at 794.)  Rosa V. had stopped taking

27

28

6

Remeron because it was ineffective and had restarted Ambien on her own. (Id.) Dr. Birnbaum cautioned Plaintiff that she should not take Ambien due her prior benzodiazepine addiction and started her on Elavil instead. (Id. at 795.)

On November 30, 2016, Plaintiff went to the emergency room at Scripps Mercy Hospital Chula Vista after being struck by a bicycle in Tijuana, Mexico. (Id. at 628, 886.) She explained that she was walking to a doctor's office and was hit on the left side by the bicycle. (Id. at 628.) She sustained a laceration to her left leg that was treated in Mexico and had come to the hospital in Chula Vista for further imaging and evaluation. (Id. at 628, 886.) A CT scan of her head and face showed maxillary (jaw) and nasal fractures. (Id. at 629.) An x-ray of her left tibia and fibula was negative. (Id.)

Rosa V. was seen in follow-up at Family Health Centers on December 6, 2016. (Id. at 883.) She reported that she was feeling better from her facial bone fractures but was unable to use her CPAP machine due to her injuries. (Id.) Nurse practitioner Adriana Celiz prescribed Zolpidem (generic Ambien) at Plaintiff's request because Plaintiff stated that it was the only medication that enabled her to sleep. (Id.) On December 20, 2016, Rosa V. attended a psychiatric medication follow-up with nurse practitioner Ruben Montanez. (Id. at 791-93.) She admitted that taking Ambien was not the best option because of her history of benzodiazepine addiction but stated that other medications had not worked for her. (Id. at 791.) Nurse Montanez prescribed Miratazapine and Vistaril and encouraged psychotherapy. (Id. at 792.) A few weeks later, Plaintiff told Nurse Montanez that the Mirtazapine increased her anxiety at night and caused her to have restless legs, so she had started taking "Sertralina," prescribed by a doctor in Tijuana. (Id. at 786.) The nurse discontinued Mirtazapine, added Zoloft, and continued Vistaril. (Id. at 787.) A brain CT scan performed on December 28, 2016, was normal. (Id. at 716.)

19cv1312-RBB

On January 11, 2017, Rosa V. told her primary care nurse practitioner that the facial injuries she sustained in the accident were improving and that she had replaced the teeth she lost in the accident.  (Id. at 875, 877.)  Randall W. Stettler, D.D.S., an oral surgeon, evaluated Plaintiff's facial injuries on January 18, 2017.  (Id. at 804-05.)  He found that she did not have any facial fractures but did have a nasal fracture; he recommended that she see an ear, nose, and throat specialist.  (Id. at 805.)  ENT Associates of San Diego referred Rosa V. to neurology for evaluation of post-concussion syndrome, recommended physical therapy for evaluation and treatment of myofascial pain, and suggested vestibular therapy for her dizziness.  (Id. at 681-84, 688, 696.) Plaintiff attended twelve sessions of physical therapy between April 20 and June 14, 2017.  (Id. at 633-80.)  Notwithstanding her complaints of dizziness, Rosa V. was able to drive herself to therapy.  (Id. at 645.)  She still felt "a little dizzy" at the conclusion of her course of physical therapy but stated that the therapy had helped to decrease her pain and dizzy spells.  (Id. at 677.)

Plaintiff resumed treatment with Dr. Sepulveda, the psychiatrist, on March 28, 2017.  (Id. at 782-85.)  He agreed to restart her on Ambien because she found that other insomnia medications were not effective.  (Id. at 783.)  He noted that Zoloft helped Rosa V. with her depression symptoms.  (Id.)  Plaintiff had successfully tapered down to 0.5 milligrams of benzodiazepines twice per day with the assistance of "benzo shots" but had been unable to continue the injections because of her insurance coverage.  (Id.)  He suspected that Plaintiff's increased anxiety and insomnia were likely symptoms of withdrawal from benzodiazepines.  (Id.)  Dr. Sepulveda found his patient's attention span and concentration to be "appropriate."  (Id.)

Plaintiff saw an optometrist on June 13, 2017, after experiencing pain and a foreign body sensation in her left eye for two months.  (Id. at 727.)  The doctor informed her that she had cataracts but that they did not require treatment unless they interfered with her

vision.  (Id. at 728.)  On July 31, 2017, Rosa V. saw Nurse Practitioner Adriana Celiz to address continuing pain on the left side of her face related to the injuries sustained in her accident.  (Id. at 869-71.)  She had been treating with a dentist in Mexico for a gum infection, had multiple dental procedures, and was taking Ketorolac for pain.  (Id. at 869.)  X-rays were negative for fractures, and Plaintiff was referred to pain management to assist with her chronic facial pain.  (Id. at 867.)  On August 4, 2017, Plaintiff began therapy with licensed clinical social worker Martha Jasso-Ramirez, whom she had previously seen in November 2015.  (Id. at 776-81; see also 600-03.)  Rosa V. exhibited an "anxious and irritated mood" but had a coherent thought process, appropriate affect, and normal memory.  (Id. at 777, 779.)  Jasso-Ramirez rated Plaintiff's clinical complexity as "mild."  (Id. at 780.)  On August 29, 2017, Rosa V. told her psychiatrist, Dr. Sepulveda, that she had undergone multiple dental surgeries that had produced pain and anxiety.  (Id. at 766-67.)  Her mental status exam was normal.  (Id.)  The psychiatrist renewed a prescription for Gabapentin that a physician in Mexico had prescribed to help Plaintiff's symptoms and noted that Plaintiff had a sleep study scheduled for the following month.  (Id. at 767.)

Plaintiff was evaluated for her chronic pain on October 10, 2017, by Annette Ramos-Haggan, N.P., of Synovation Medical Group.  (Id. at 700-03.)  She described jaw pain radiating into her head, aching pain in the back of her head, and neck pain radiating down her arms.  (Id. at 700.)  Thoracic x-rays revealed scoliosis.  (Id. at 709.)  An MRI of Plaintiff's cervical spine showed right posterior disc spur complex at C3-4 and right foraminal stenosis that correlated for right C4 radiculopathy but was otherwise normal.  (Id. at 707-08.)  Nurse Ramos-Haggan reviewed Plaintiff's images with her on October 31, 2017; Rosa V. stated that she wanted to try acupuncture before considering other treatment options.  (Id. at 704.)  Plaintiff attended eleven session of acupuncture for her neck pain between November 2, 2017, and April 12, 2018.  (Id. at 730-40.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

When Rosa V. saw Dr. Sepulveda on November 30, 2017, she was very anxious about a "botched dental procedure" that had been performed in Mexico. (Id. at 763-65.) She had previously described this to her primary care provider as a "hole" in her mouth which made a whistle sound when she spoke. (Id. at 862.) The dentist apparently told Plaintiff that no further corrective measures could be taken; this caused Plaintiff great distress. (Id. at 763.) Rosa V. had stopped taking Gabapentin but asked to restart this medication and continue her prescription for Ambien. (Id. at 763-64.)

A little over two months later, on February 8, 2018, Rosa V. informed Dr. Sepulveda that she was still struggling with anxiety and chronic pain in her jaw area. (Id. at 760-62.) She planned to undergo additional dental surgery in Mexico with a different surgeon. (Id. at 760.) On April 3, 2018, Rosa V. returned to Nurse Practitioner Celiz because of continued pain in Rosa V.'s left jaw area. (Id. at 858-61.) On May 17, 2018, Plaintiff told Dr. Sepulveda that she had attempted to taper off Ambien but doing so had worsened her mood and insomnia, which reportedly resulted in two hospitalizations in Mexico. (Id. at 757-59.)[5] He continued her Ambien prescription, increased her dosage of Gabapentin, and recommended ongoing therapy. (Id. at 758.)[6]

/ / /

/ / /

/ / /

---

[5] These hospitalizations reported by Rosa V. may conflict with the ALJ's observation that Plaintiff's medical record does not describe "sustained psychiatric hospitalizations due to psychological symptoms." (See Admin. R. 27, ECF No. 16.) Neither party, however, has briefed this issue and the record does not contain any further reference to these hospitalizations.

[6] The administrative record contains medical records submitted to the Social Security Administration after the ALJ's decision. (See Admin. R. 37-116, ECF No. 16.) The district court's function is to review the correctness of the Commissioner's decision at the time it was made. Hudson v. Bowen, 849 F.2d 433, 435 (9th Cir. 1988). For this reason, and because Plaintiff's argument does not rely upon the supplemental records, the Court has not considered these records in its decision.

1

**B.**    **Hearing Testimony**

2

On June 20, 2018, Rosa V. appeared with her attorney at a hearing before ALJ

3

Levine.  (Id. at 117.)  Vocational expert Sonia Peterson also briefly testified.  (Id. at 117,

4

123-24.)

5

**1.    Plaintiff's testimony**

6

Plaintiff, whose primary language is Spanish, (see id. at 280), testified with the

7

assistance of an interpreter.  (Id. at 119.)  She stated that she had stopped working in

8

November 2014 because she could not sleep and had a lot of pain.  (Id. at 122.)  She

9

believed her insomnia was the primary factor behind her collision with the bicycle.  (Id.)

10

Rosa V. testified that the injections she had received in Mexico were "[p]robably . . .

11

tranquilizers for the pain."  (Id. at 123.)  She confirmed that her prior job required her to

12

lift more than fifty pounds.  (Id. at 124.)  Her medications at the time of the hearing

13

included Gabapentin, Tylenol, and Zolpidem or Ambien, which she stated were the same.

14

(Id. at 125.)  Rosa V. stated that the Zolpidem had lost some of its effectiveness and that

15

she was sleeping only four hours a night.  (Id. at 125-26.)  She helped around the house

16

by washing dishes and sweeping leaves.  (Id. at 126.)  She received a worker's

17

compensation settlement of $16,000 from the hotel where she was previously employed

18

and had used some of the money for her dental care.  (Id. at 127.)  She suffered an injury

19

to her ear in the bicycle accident that caused her to experience dizzy spells more than

20

thirty times a day.  (Id. at 127-28.)  Nausea and vomiting accompanied her dizzy spells

21

on occasion.  (Id. at 128.)

22

**2.    Vocational expert's testimony**

23

Vocational expert Peterson described Plaintiff's past work as that of a "house

24

cleaner."  (Id. at 124.)  She explained that even though Plaintiff had cleaned hotel rooms,

25

because she had performed her past work at a heavy level, Plaintiff's work was better

26

27

28

11

1    classified as "house cleaner," which was considered "heavy" work, rather than "cleaner

2    housekeeping," which was considered to be "light."[7]

3    **C.    ALJ's Decision**

4            On September 18, 2018, the ALJ issued a decision finding that Rosa V. had not

5    been under a disability, as defined in the Social Security Act, from her alleged onset date

6    through the date of the decision.  (Id. at 22-31.)  Judge Levine stated that Plaintiff met the

7    insured status requirements of the Social Security Act through September 30, 2020.  (Id.

8    at 25.)  He determined that Plaintiff had not engaged in substantial gainful activity since

9    November 4, 2014, the alleged onset date.  (Id. at 23.)  The ALJ found that Rosa V. had

10   the severe impairment of degenerative disc disease of the lumbar spine.  (Id. at 25.)  The

11   ALJ considered Plaintiff's degenerative disc disease of the cervical spine, scoliosis,

12   vertigo, status post facial fractures, history of benzodiazepine dependence in remission,

13   sleep apnea, and cataracts to not be severe impairments.  (Id.)  The ALJ found that, singly

14   or in combination, Plaintiff did not have impairments that met or medically equaled a

15   listing.  (Id. at 28.)  He further determined that Rosa V. had the residual functional

16   capacity ("RFC")[8] to perform the full range of medium work.  (Id. at 28.)[9]  The ALJ

---

[7] Under the Social Security Regulations, occupations are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567 (2019).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  Id. § 404.1567(b).  "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more."  Id. § 404.1567(d).

[8] Residual functional capacity is "the most you can still do despite your limitations."  See 20 C.F.R. § 404.1545(a)(1).

[9] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).

19cv1312-RBB

1  concluded that Plaintiff was unable to perform her past relevant work but that Medical-

2  Vocational Rule 203.11[10] directed a finding of "not disabled."  (Id. at 30-31.)

3          **II.     LEGAL STANDARDS**

4          Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful

5  applicants to seek judicial review of a final agency decision of the Commissioner.  42

6  U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited,

7  however, and the denial of benefits "'will be disturbed only if it is not supported by

8  substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human

9  Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529

10  (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014).

11  Substantial evidence means "'more than a mere scintilla but less than a preponderance; it

12  is such relevant evidence as a reasonable mind might accept as adequate to support a

13  conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews

14  v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the entire

15  record, including the evidence that supports and detracts from the Commissioner's

16  conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir.

17  1988).  If the evidence supports more than one rational interpretation, the court must

18  uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  The

19  district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. §

20  405(g).  The matter may also be remanded to the Social Security Administration for

21  further proceedings.  Id.

22          To qualify for disability benefits under the Social Security Act, a claimant must

23  show two things:  (1) The applicant suffers from a medically determinable impairment

24

25

26  [10] Medical-Vocational Rule 203.11 directs a finding of "not disabled" for a person of advanced age who
is limited to medium work, has a limited education, and has an unskilled work background.  20 C.F.R.,

27  Pt. 404, Subpt. P, App. 2, Rule 203.11.

28

1    that can be expected to result in death or that has lasted or can be expected to last for a

2    continuous period of twelve months or more; and (2) the impairment renders the

3    applicant incapable of performing the work that he or she previously performed or any

4    other substantially gainful employment that exists in the national economy.  See 42

5    U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both

6    requirements to be classified as "disabled."  Id.  The applicant bears the burden of

7    proving he or she was either permanently disabled or subject to a condition which

8    became so severe as to disable the applicant prior to the date upon which his or her

9    disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

10         The Commissioner makes this assessment by employing a five-step analysis

11   outlined in 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99

12   (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a

13   claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.

14   20 C.F.R. § 404.1520(b) (2019).  Second, the Commissioner determines whether the

15   claimant has a "severe impairment or combination of impairments" that significantly

16   limits the claimant's physical or mental ability to do basic work activities.  If not, the

17   claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's

18   impairment is compared to a list of impairments that are presumed severe enough to

19   preclude work; if the claimant's impairment meets or equals one of the listed

20   impairments, benefits are awarded.  Id. § 404.1520(d).  If not, the claimant's residual

21   functional capacity is assessed and the evaluation proceeds to step four.  Id.

22   § 404.1520(e).  Fourth, the Commissioner determines whether the claimant can do his or

23   her past relevant work.  If the claimant can do their past work, benefits are denied.  Id.

24   § 404.1520(f).  If the claimant cannot perform his or her past relevant work, the burden

25   shifts to the Commissioner.  In step five, the Commissioner must establish that the

26   claimant can perform other work.  Id. § 404.1520(g).  If the Commissioner meets this

burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

### III.    DISCUSSION

Plaintiff's sole argument is that the ALJ erred by rejecting the opinions of state agency psychological consultants Heather Barrons, Psy. D., and Kim Morris, Psy. D. (Pl.'s Mot. Attach. #1 Mem. P. & A. 4-9, ECF No. 23.)

**A.    State Agency Physicians' Opinions**

On April 8, 2016, Dr. Barrons made the following notation in Plaintiff's claim record:

> A [consultative examination] is not needed.  The prior file (2015) included a [psychological consultative examination] showing no more than mild limitations.  Recent [mental status examination] shows no memory or concentration problems.  Her entire [mental status examination] was [within normal limits].  The [claimant] does have difficulties with insomnia which is likely to contribute to her subjective experience of cognitive problems but the evidence does not support a genuine cognitive disorder.  Her [activities of daily living] remain intact.  She is able to go out alone and manage her finances.  Giving the [claimant's] subjective complaints some benefit of the doubt, she may have mild to moderate limits in [concentration, persistence, and pace] at times but remains capable of sustaining a detailed routine.  Please see [psychiatric review technique/mental residual functional capacity].

(Admin. R. 138, ECF No. 16.)  Dr. Barrons considered Plaintiff's anxiety to be a severe impairment.  (Id. at 139.)  In her psychiatric review technique assessment, Dr. Barrons determined that Rosa V. had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  (Id.)  The mental residual functional capacity assessment completed by Dr. Barrons indicated that Plaintiff was moderately limited in the ability to maintain attention and concentration for

extended periods and to complete a normal workday and workweek without interruption from psychologically based symptoms.  (Id. at 141.)  The doctor explained:

> [Claimant] is capable of understanding, remembering and sustaining concentration, pace and persistence for detailed (3-4 step) routines throughout a normal workday/workweek.  [Claimant] is able to accept routine supervision and interact with co-workers.  [Claimant] is capable of public contact.  [Claimant] is capable of adapting to a routine and predictable work environment, recognizing typical hazards, traveling to routine locations, and setting goals independently within the framework noted above.

(Id. at 142.)  Dr. Morris affirmed Dr. Barrons's findings on September 14, 2016.  (Id. at 154.)

Plaintiff argues that the ALJ erred by impermissibly rejecting the opinions of Drs. Barrons and Morris.  (Pl.'s Mot. Attach. #1 Mem. P. & A. 4-9, ECF No. 23.)  In her view, the opinions of these doctors that she was moderately limited in the ability to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruption from psychologically based symptoms should have been credited by the ALJ.  (Id. at 5-7.)  She contends that the ALJ should have treated the state agency psychologists as "highly qualified experts" but he instead improperly found that the opinions of these doctors were inconsistent with the other psychological evidence in the record.  (Id.)  Defendant argues that substantial evidence supports the ALJ's evaluation of the medical opinions in the record.  (Def.'s Mot. 6-14, ECF No. 24.)

/ / /

/ / /

/ / /

/ / /

/ / /

16

**B.    Application of Standards Under 20 C.F.R. § 404.1527**

The ALJ must evaluate all medical opinions he receives in determining whether a claimant is disabled.  20 C.F.R. § 404.1527 (2019).[11]  Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  Id. § 404.1527(a)(1).  Generally, more weight is given to the opinions of treating sources than of nontreating sources.  Id. § 404.1527(c)(2); see also Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)  If a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with" other evidence in the record, the ALJ will give it controlling weight.  20 C.F.R. § 404.1527(c)(2).  If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ will consider the following factors when deciding the weight to give to any medical opinion:  (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency with the record as a whole; (5) specialization; and (6) any other relevant factors.  Id. § 404.1527(c)(1)-(6).

Federal and State agency medical or psychological consultants "are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. § 404.1513a(b)(1) (2019).  Although the ALJ must consider administrative medical findings and medical evidence from these consultants, he is "not required to adopt [their] prior administrative medical findings[.]"  Id.  Rather, the ALJ must give weight to these opinions according to the applicable standards.  Id.  In this case, the ALJ gave "little weight" to the opinions of state agency psychological consultants Dr. Barrons and Dr.

---

[11] The standard for evaluating opinion evidence is set forth in 20 C.F.R. § 404.1527 for claims, such as Plaintiff's, filed before March 27, 2017.

Morris.  In doing so, he explained, "Their finding that the claimant has severe mental impairments is inconsistent with psychological evidence outlined above, which shows conservative treatment with routinely normal mental status findings showing appropriate behavior, emotional control, and cognitive functioning."  (Admin. R. 30, ECF No. 16.)

The ALJ could properly assign little weight to the opinions of the state agency psychological consultants in this case under the factors set forth in 20 C.F.R. § 404.1527. Drs. Barrons and Morris neither examined nor treated Rosa V., and thus their opinions were entitled to less weight than the opinions of sources who did examine and treat Plaintiff.  20 C.F.R. § 404.1527(c)(1)-(2).  The explanation offered by Dr. Barrons to support her opinion that Plaintiff had moderate psychological limitations was not based upon medical signs and laboratory findings but rather relied upon giving Rosa V.'s subjective complaints "some benefit of the doubt."  (Admin. R. 138, ECF No. 16.)  This decreases the "supportability" of Dr. Barrons's and Dr. Morris's opinions.  See 20 C.F.R. § 404.1527(c)(3) (providing that a medical opinion supported by "relevant evidence" such as "medical signs and laboratory findings" is entitled to more weight than one that does not).  The inconsistency of these doctors' opinions with the record as a whole also provides a basis to give these opinions lesser weight under 20 C.F.R. § 404.1527.  In general, the more consistent a medical opinion is with the record as a whole, the more weight is given to the opinion.  Id. § 404.1527(c)(4).  Here, the only medical evidence in the record suggesting that Plaintiff's insomnia gave rise to moderate limitations of concentration, persistence, and pace and the ability to complete a full workday are the opinions of the state agency psychological consultants.  (Admin. R. 138-39, 154, ECF No. 16.)  None of the treating or examining physicians made such a finding.  In fact, their treatment notes consistently reflect that Plaintiff's attention span and concentration was "appropriate" (using a rating system of "appropriate," "fair," "impaired," and "easily distracted").  (See id. at 595, 598, 614, 623, 758, 761, 764, 783, 795, 798.)  Furthermore,

no examining or treating doctor opined that Plaintiff's ability to complete a full workday was affected by her mental impairments or any other impairments.

The extent to which a medical source is familiar with other information in a claimant's case record is also relevant in deciding the weight to be given to a medical opinion.  Id. § 404.1527(c)(6).  The record had not yet been fully developed regarding Plaintiff's insomnia at the time Dr. Barrons rendered her opinion.  Rosa V.'s sleep study showing that she had sleep apnea had not yet taken place, (see Admin. R. 626-27, ECF No. 16), and Dr. Sepulveda had not yet determined whether Rosa V. "subjectively feels lack of sleep" or has "true insomnia," (see id. at 613.)  On multiple occasions after Dr. Barrons rendered her opinion, Plaintiff's treating doctors found that notwithstanding Plaintiff's claim of severe insomnia, she appeared alert and rested on examination, had appropriate attention span and concentration, and had coherent thought process.  (See Admin. R. 613, 779, 783, ECF No. 16.)  Medical evidence developed after Dr. Barrons rendered her opinion also demonstrated that Ambien helped Plaintiff's insomnia.  (See id. at 758 ("[S]till finds [A]mbien helpful."); 763-64, 783; see also Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling . . . .").)  It does not appear that Dr. Morris was familiar with this information at the time she affirmed the conclusions reached by Dr. Barrons.  (See Admin. R. 152-53, ECF No. 16.)  The doctors' lack of familiarity with other information in Plaintiff's medical record could properly be taken into consideration by the ALJ in giving their opinions lesser weight.  See 20 C.F.R. § 404.1527(c)(6).

The conclusion of a nonexamining physician is entitled to less weight than the conclusion of an examining physician.  Lester, 81 F.3d at 830; see also Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984) ("A report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record.").  Here, the opinions of Drs.

Barrons and Morris were not supported by other evidence in the record and thus did not constitute substantial evidence that Rosa V.'s insomnia caused moderate limitations in her mental functioning.  Although state agency consultants are considered "highly qualified and experts" in the evaluation of Social Security disability claims, an ALJ is not required to adopt their medical findings and may allocate weight to their opinions under the applicable standards.  See 20 C.F.R. § 404.1513a(b)(1).  Judge Levine, who considered all opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527, (see Admin. R. 28, ECF No. 16), could reasonably accord little weight to the opinions of state agency consultants Dr. Barrons and Dr. Morris under this regulation.

## C.    Normal Mental Status Findings

Plaintiff disputes that the ALJ properly gave little weight to Dr. Barrons's and Dr. Morris's opinions.  She argues that the ALJ erred by relying on her normal mental status examinations to reject the state agency physicians' opinions because her cognitive problems arose from the lack of sleep, not her anxiety.  (Pl.'s Mot. Attach. #1 Mem. P. & A. 6-7, ECF No. 23.)  The ALJ recognized that Plaintiff complained of insomnia but observed that "her mental status examinations have routinely found her to be alert and oriented with normal thought processes, associations, thought content, fund of knowledge, attention span, concentration, recent memory, and remote memory."  (Admin. R. 26, ECF No. 16 (citations omitted).)  Judge Levine also acknowledged Rosa V.'s complaints with task completion, concentration, and fatigue, but noted that "evidence of alertness with intact cognitive functioning does not support more than a mild limitation . . . ." (Id. at 27.)

As discussed above, the only evidence in the record that Plaintiff had any functional limitations resulting from her insomnia were the opinions of

nonexamining physicians Drs. Barrons and Morris.  The medical evidence, however, does not support Dr. Barrons's and Dr. Morris's conclusions.  None of Rosa V.'s treating or examining physicians provided any indication that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace, and none stated that her insomnia or other mental impairments would negatively impact her ability to complete a normal workday and workweek.  Rather, the record consistently reflects that Plaintiff's mental exams by her treating physicians were unremarkable, and her attention span and concentration was "appropriate" and not impaired.  (See Admin. R. 595, 598, 614, 623, 758, 761, 764, 783, 795, 798, ECF No. 16.)  Indeed, Dr. Barrons herself ultimately concluded that despite Rosa V.'s limitations, Plaintiff "remain[ed] capable of sustaining a detailed routine" and was "capable of understanding, remembering and sustaining concentration, pace and persistence for detailed (3-4 step) routines throughout a normal workday/workweek."  (See id. at 138, 142.)  The ALJ could properly rely upon Rosa V.'s routinely normal mental status findings in giving little weight to the state agency psychologists' opinions because substantial evidence supports his interpretation of the record.

**D.   "Conservative" Treatment**

Plaintiff also contests the ALJ's determination that Rosa V. received only conservative treatment, arguing that "the ALJ cannot fault [her] for failing to pursue non-conservative treatment options if none exist[]" and that "[i]n the realm of mental health, surgical intervention is not [a] common treatment course."  (Pl.'s Mot. Attach. #1 Mem. P. & A. 7-8, ECF No. 23.)  The Commissioner observes that the ALJ considered Plaintiff's treatment to be conservative because she did not have "recurrent emergency visits or sustained psychiatric hospitalization."  (Def.'s Mot. 6-10, ECF No. 24.)  This limited view of the medical record is not

1  compelling.  Although not the basis for Plaintiff's challenge, several courts have

2  suggested that the prescription of psychotropic medications should not be

3  considered conservative treatment.  See, e.g., Green v. Berryhill, Case No.: 2:17-

4  cv-01339-APG-NJK, 2018 WL 4291960, at *5 (D. Nev. Aug. 20, 2018) ("The

5  Ninth Circuit and other courts have recognized within the context of mental health

6  conditions that the prescription of psychiatric medications is not indicative of

7  conservative treatment.") (citing Drawn v. Berryhill, 728 Fed. Appx. 637, 642 (9th

8  Cir. 2018)); see also Mason v. Colvin, No. 1:12-cv-00584 GSA, 2013 WL

9  5278932, at *6 (E.D. Cal. Sept. 18, 2013) (finding plaintiff's treatment not

10  conservative because she took prescription antidepressants and other medications

11  and received mental health treatment from a psychiatrist and social worker).  In

12  light of these cases as well as the reference in the record that Plaintiff may have

13  had two mental health-related hospitalizations in Mexico, (see Admin. R. 758, ECF

14  No. 16), the ALJ's statement that Plaintiff's mental health treatment was

15  conservative ignores Rosa V.'s entire medical history.

16       Nevertheless, even if the ALJ could not properly rely on Plaintiff's

17  "conservative treatment" as a basis to discount the state agency doctors'

18  psychological opinions, the ALJ still properly relied on Plaintiff's routinely normal

19  mental status findings to discount their opinions and his conclusion that Rosa V.

20  had at most mild mental functional limitations was supported by substantial

21  evidence.  See Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) ("In

22  determining whether the Commissioner's findings are supported by substantial

23  evidence, we must review the administrative record as a whole, weighing both the

24  evidence that supports and the evidence that detracts from the Commissioner's

25  conclusion."); Sandgathe v. Chater, 108 F.3d at 980 ("Substantial evidence is

26  "more than a mere scintilla but less than a preponderance; it is such relevant

27

28

evidence as a reasonable mind might accept as adequate to support a conclusion."). Therefore, even though it is questionable whether Plaintiff's treatment was conservative, this does not alter the Court's finding that the other bases for giving little weight to the opinions of Drs. Barrons and Morris were supported by the record and that substantial evidence buttresses his interpretation of the medical evidence.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is **DENIED**, and Defendant's cross-motion for summary judgment is **GRANTED**.

This Order concludes the litigation in this matter.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  June 29, 2020

_____
Hon. Ruben B. Brooks
United States Magistrate Judge